STATE OF NORTH CAROLINA v. JIMMY HARRIS

No. COA00-899

(Filed 19 March 2002)

**1. Evidence— prior crimes or bad acts—stale conviction—
felony aggravated battery**

The trial court erred in a first-degree murder prosecution by
permitting the State to cross-examine defendant under N.C.G.S.
§ 8C-1, Rule 609 about his 1984 conviction in Florida for felony
aggravated battery, because: (1) the stale conviction sheds no
light on defendant's veracity, but instead characterizes defendant
as a woman abuser and a violent person who would have been
likely to hit the victim in the head with a hammer; (2) there is a
strong possibility that the introduction of this prior conviction
caused the jury to find defendant guilty of first-degree murder
rather than a lesser crime; and (3) the substantial likelihood
of prejudice outweighed the minimal impeachment value of the
evidence.

**2. Evidence— prior crimes or bad acts—ball bat incident—
assault**

The trial court did not abuse its discretion in a first-degree
murder prosecution by admitting evidence under N.C.G.S. § 8C-1,
Rule 404(b) concerning a "ball bat incident" between defendant

STATE v. HARRIS

[149 N.C. App. 398 (2002)]

and the victim, including testimony that defendant pushed and shoved the victim while she begged defendant to leave her alone, because: (1) this evidence of defendant's prior assault on the victim tends to establish malice, premeditation, deliberation, intent, and ill-will on the part of defendant; (2) the evidence is relevant to an issue other than defendant's character; and (3) the incident was not too remote in time as to run afoul of the balancing test since the incident occurred only a few months prior to the victim's death and tended to show a common plan or scheme, absence of accident, and tended to negate self-defense.

Appeal by defendant from judgment entered 19 November 1999 by Judge Hollis M. Owens, Jr. in Graham County Superior Court. Heard in the Court of Appeals 6 November 2001.

*Attorney General Roy Cooper, by Assistant Attorney General Philip A. Lehman, for the State.*

*Rudolf Maher Widenhouse & Fialko, by Andrew G. Schopler, for defendant-appellant.*

CAMPBELL, Judge.

At approximately nine o'clock on the night of 31 October 1998, Benita Gregory ("Benita") went to visit defendant (who lived a few houses away from Benita) while her brother babysat Benita's seven-year-old disabled son, Nathaniel. When two hours had passed and Benita had not returned home, Benita's brother took Nathaniel over to defendant's house. Upon entering defendant's house, Nathaniel found his mother drinking and arguing with defendant. Benita told Nathaniel to leave the room in which she and defendant were arguing and to go into the kitchen. The argument continued and ultimately resulted in Benita falling to the floor. In the course of these events Benita received a severe head injury. Although Benita was bleeding and had difficulty talking or getting up from the floor, she indicated she did not want anyone to call for help.[1]

Defendant took Benita to the hospital at approximately eight o'clock the next evening (1 November 1998). Defendant told medical personnel that Benita had fallen and hit her head. The initial examination at the hospital revealed that Benita had suffered "an acute

---

1. There was some evidence that Benita may have been afraid the Department of Social Services might take Nathaniel away from her if they discovered that she had been drinking.

cerebral event." Over the next several hours, Benita's condition quickly deteriorated and she soon became unresponsive. She was eventually declared dead on 3 November 1998.

The police began their investigation on 2 November 1998 when medical personnel reported that Benita was in critical condition. Nathaniel was the first person interviewed. At that time, Nathaniel stated that he saw his mother arguing and wrestling with defendant just before she fell, hitting her head on a heater in defendant's living room. However, when the police interviewed Nathaniel again on 4 November 1998, he said that defendant had hit his mother in the head with a hammer. Nathaniel also said that he was scared of defendant and was afraid that defendant would do something to him if he talked about the incident.

Defendant fully cooperated with the police investigation, which included consenting to interviews, searches, and agreeing to tests. Defendant was first questioned by the police on 2 November 1998 and, consistent with Nathaniel's original statement, he also said that Benita had fallen and hit her head on a kerosene heater. When the police went to defendant's house two days after the incident, they found no signs of cleanup. Blood was still on the floor and on defendant's mattress. A hammer with some blood and a strand of hair on it was also found on the floor. Laboratory analysis later confirmed that the blood on the floor and the mattress belonged to Benita. The blood on the hammer belonged to defendant, but the strand of hair was consistent with Benita's hair. There were no fingerprints on the hammer. No blood or hair was found on the heater.

A warrant was issued for defendant's arrest on 3 November 1998 for first-degree murder of Benita. Defendant promptly surrendered himself upon being informed about the warrant. In a statement made following his arrest, defendant said that Benita had threatened to hit him with a tequila bottle on the night of 31 October 1998 and that he had swung his walking stick at Benita in self-defense causing her to fall. Defendant assumed that he had hit her in the head. However, when a detective reminded defendant that in an earlier statement he had said that Benita fell on a heater, he replied, "I don't know. I was scared."

During his pre-trial incarceration, defendant was afflicted with severe psychiatric and physical health issues. During all times to this action, defendant was on disability and received medica-

tions for a serious heart problem and brain damage with partial paralysis, which required him to use a walking stick. Prior to trial, defendant was hospitalized on three occasions. Nevertheless, he was declared competent to stand trial after receiving the necessary medication.

The day before opening arguments, defendant was rushed to the hospital for treatment of high blood pressure and apparent over-medication. Although defense counsel informed the trial court of defendant's overmedication, the presiding judge, Judge Hollis M. Owens, Jr. ("Judge Owens"), did not hold a competency hearing. A similar situation arose in the middle of the trial.

During the trial, the State called Nathaniel as one of its witnesses. Nathaniel testified that he never actually saw defendant pick up a hammer. However, he did see defendant hit Benita in the head with a hammer as defendant said, "You f—king bitch, I'm going to kill you."

Following Nathaniel's testimony, the State moved under Rule 404(b) of the Rules of Evidence ("Rule 404(b)") to introduce evidence from three witnesses concerning the nature of the relationship between defendant and Benita. Over defendant's objections, Judge Owens admitted this evidence as tending to show a common scheme, as well as the absence of an accident and a negation of self-defense. Thereafter, the witnesses (Cathy Lane, Geraldine Jordan, and Diane Hall) testified about an argument between Benita and defendant that took place approximately three months prior to her death. Even though none of the witnesses saw the beginning of this argument, they each testified to seeing defendant push and shove Benita several times during the argument. They also saw a baseball bat which, during the course of the argument, was in the possession of each party and was used by each party to hit defendant's vehicle. Finally, all three witnesses testified that they had not seen Benita act aggressively towards or threaten defendant during this incident or any other.

Dr. John Butts ("Dr. Butts"), Chief Medical Examiner for the State of North Carolina, testified as a medical expert for the State. Dr. Butts had performed Benita's autopsy on 5 November 1998. The autopsy revealed that swelling and bruising of Benita's brain had prevented the flow of blood to her brain, which caused brain damage and an acute stroke to the right side of her brain. In Dr. Butts' opinion, the swelling and bruising of Benita's brain was caused by a blunt force

impact to the right side of her head. He also opined that the bruise pattern was consistent with a blow from a hammer and not a heater. However, a neurologist testified that there was a small possibility that a stroke of this type could have been caused by Benita's history of diabetes, obesity, and heart disease.

Defendant testified that he had known Benita for no more than five months before her death and had not had a romantic or sexual relationship with her during that time (although Benita had told her friends otherwise). As to the circumstances surrounding Benita's death, defendant testified as follows: On the night of 31 October 1998, Benita arrived at defendant's house by herself sometime after 9:30 p.m. and had three or four shots of tequila. When Nathaniel arrived at defendant's house two hours later, defendant asked Benita to leave. She became very upset and tried to hit defendant with a tequila bottle. Defendant knocked the bottle out of her hand with his walking stick. Benita, appearing both upset and drunk, turned to leave, but stumbled sideways. She fell over and hit her head on a kerosene heater. Benita told defendant she was alright, but was tired and did not want to go home. Defendant reluctantly let her spend the rest of the night on his floor. Defendant did not see any blood until the next afternoon when he splashed water on Benita's face to wake her up. Defendant took Benita to the hospital a few hours later.

Prior to defendant's cross-examination, Judge Owens ruled that the State could impeach defendant with a 1984 conviction in Florida for felony aggravated battery against his then wife by the use of a bullwhip. This conviction was defendant's only prior conviction and was more than ten years old. Judge Owens admitted this evidence under Rule 609 of the Rules of Evidence ("Rule 609") on the grounds that the old conviction combined with other evidence demonstrated a pattern of behavior and that defendant's credibility was central to the resolution of his case. Defense counsel timely objected and excepted to the court's ruling.

On 19 November 1999, a jury returned a verdict of guilty of first-degree murder. Judge Owens sentenced defendant to life imprisonment without parole. Defendant appeals this judgment.

[1] By defendant's first assignment of error he argues the trial court committed reversible error by permitting the State to cross-examine him about his 1984 conviction in Florida for felony aggravated battery. We agree.

**STATE v. HARRIS**

[149 N.C. App. 398 (2002)]

Rule 609 allows for the impeachment of a witness during cross-examination by offering evidence of that witness' prior criminal conviction(s). *See* N.C. Gen. Stat. § 8C-1, Rule 609(a) (1999). Rule 609 also states:

> Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

§ 8C-1, Rule 609(b).

A defendant's prior criminal convictions "are not to 'be considered as substantive evidence that [defendant] committed the crimes' for which he is presently on trial by characterizing him as 'a bad man of a violent, criminal nature . . . clearly more likely to be guilty of the crime charged.' " *State v. Carter*, 326 N.C. 243, 250, 388 S.E.2d 111, 116 (1990) (quoting *State v. Tucker*, 317 N.C. 532, 543, 346 S.E.2d 417, 423 (1986)). In fact, our Supreme Court has held that "[t]he only 'legitimate purpose' for admitting a defendant's past convictions is to cast doubt upon his veracity[.]" *Id.* Thus, the most probative type of prior conviction admissible for impeachment purposes is "an offense that indicates a lack of veracity, such as fraud, forgery or perjury." *United States v. Beahm*, 664 F.2d 414, 418-19 n.6 (4th Cir. 1981) (citations omitted).

During the trial, the court allowed the State to cross-examine defendant about his more than ten-year-old conviction for felony aggravated battery. After a careful review of the record and transcript, it appears highly probable that the jury would have found sufficient evidence to convict defendant of Benita's murder without evidence of the 1984 conviction having been introduced. However, since this stale conviction sheds no light on defendant's veracity, but instead characterizes defendant as a woman abuser and a violent person who would have been likely to hit Benita in the head with a hammer, there is a strong possibility that the introduction of this prior conviction caused the jury to find defendant guilty of first-degree murder rather than a lesser crime. Therefore, we conclude that the evidence of defendant's conviction in 1984 should not have been admitted because the substantial likelihood of prejudice outweighed the minimal impeachment value of the evidence.

**[2]** Despite our decision to grant defendant a new trial based on his first assignment of error, we also address defendant's second assignment of error because of the likelihood of it becoming an issue in a retrial. Defendant argues that the trial court's decision to admit evidence concerning the "ball bat incident" between him and Benita violated Rule 404(b). We disagree.

Rule 404(b) governs the admissibility of a defendant's prior bad acts. *See* N.C. Gen. Stat. § 8C-1, Rule 404(b) (1999). This rule states, in part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

*Id.*

In applying Rule 404(b), our Supreme Court has consistently held "that a defendant's prior assaults on the victim, for whose murder defendant is presently being tried, are admissible for the purpose of showing malice, premeditation, deliberation, intent or ill will against the victim." *State v. Alston*, 341 N.C. 198, 229, 461 S.E.2d 687, 703 (1995) (citations omitted). In the case *sub judice*, evidence of the "ball bat incident" provided by the witnesses included testimony that defendant pushed and shoved Benita while she begged him to leave her alone. This evidence of defendant's prior assault on Benita, likewise tends to establish malice, premeditation, deliberation, intent and ill will on the part of defendant. Thus, the evidence is relevant to an issue other than defendant's character. We therefore hold that evidence of the "ball bat incident" was admissible under Rule 404(b).

Furthermore, this Court has held that "[w]hen prior incidents are offered for a proper purpose, the ultimate test of admissibility is whether they are sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in Rule 403." *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991). Admission of evidence under Rule 403 is a matter generally left to the sound discretion of the trial court. Abuse will only be found where the trial court's ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned

decision." *State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133 (1993).

The trial court in the present case made no specific finding that the probative value of evidence relating to the "ball bat incident" outweighed its prejudicial effect. However, as long as the procedure followed by the trial court demonstrates that a Rule 403 balancing test was conducted, a specific finding is not required. *See State v. Washington*, 141 N.C. App. 354, 367, 540 S.E.2d 388, 397-98 (2000), *disc. review denied*, 353 N.C. 396, 547 S.E.2d 427 (2001). Here, the record and trial transcript indicate that the court determined the "ball bat incident" was not too remote in time as to run afoul of the balancing test because the incident occurred only a few months prior to Benita's death and tended to show a common plan or scheme, absence of accident, and tended to negate self-defense. Therefore, the trial court did not abuse its discretion in admitting evidence of the "ball bat incident" because the evidence was more probative than prejudicial.

Since we reverse the trial court for the improper admission of the stale conviction, we see no need to address defendant's third assignment of error regarding whether the court erred in not holding a hearing to determine his competency since the circumstances would likely be entirely different on a retrial. However, for the reasons stated, we reverse the trial court and grant defendant a new trial.

New trial.

Judges GREENE and McCULLOUGH concur.