IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1102

Filed 4 February 2026

Johnston County, Nos. 23CR015983-500, 23CR418766-500, 23CR419094-500

STATE OF NORTH CAROLINA

v.

ERVIN TOOMER, Defendant.

Appeal by defendant from judgment entered 30 May 2024 by Judge Keith O. Gregory in Superior Court, Johnston County. Heard in the Court of Appeals 13 August 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Amanda J. Reeder, for the State.*

*W. Michael Spivey for defendant-appellant.*

STROUD, Judge.

A jury found Defendant Ervin Toomer guilty of misdemeanor assault on a female and felonious restraint. He later pleaded guilty to attaining habitual felon status. On appeal, he raises two challenges. First, he argues that the trial court erred in allowing the State to impeach him with his 1996 convictions for second-degree kidnapping and robbery with a dangerous weapon under Rule 609(b) of the North Carolina Rules of Evidence. Second, he claims that the court violated his constitutional right to a twelve-person jury by substituting an alternate juror after deliberations began. We hold that Defendant received a fair trial, free of prejudicial

error.

## I. Background

The evidence presented to the jury tended to show the following. Defendant met Starnasia Shaw (Shaw) in 2021 when she began working at Smithfield's Chicken 'N Bar-B-Q. Shaw was sixteen and still in high school. Defendant was one of her supervisors. The two did not develop any relationship beyond coworkers until Shaw turned eighteen in February 2023.

After Shaw's eighteenth birthday, she and Defendant began spending time together—smoking marijuana on work breaks and occasionally engaging in some physical acts, but never sex. Shaw testified that their relationship was not "serious." Defendant, who was fifty-two, similarly characterized their connection as "nothing sexual" but rather "more [of] a smoke buddy type thing," though he admitted having "romantic" feelings for Shaw. Both agreed that Defendant often gave Shaw rides to and from work because she lacked a car.

In the summer of 2023, Shaw told Defendant that their relationship needed to change—she wanted to be just "friends for real." She had told her mother how old Defendant was, and her mother disapproved. Shaw testified that Defendant became upset. He disputed this, claiming that he was the one who wanted to end any close relationship because of Shaw's conduct during a trip to Florida.

In August 2023, Defendant and Shaw left Smithfield's to work at Taco Bell— located just a few minutes from Shaw's home. About a month later, on 21 September,

Shaw asked Defendant to drive her to Taco Bell to retrieve a bag she had left there. When he picked her up, Shaw testified, Defendant was upset about the tight clothing she wore. He yelled at her and slapped her in the car. She said that he would not let her leave and drove her around for some time before eventually taking her home.

The next night, Shaw and Defendant worked the same shift at Taco Bell, which ended around 1:00 a.m. on 23 September. Shaw, Defendant, and another employee smoked marijuana together in Defendant's car during a break that evening. Shaw testified that Defendant apologized for his behavior the previous day but still seemed angry. Defendant countered that he was quiet but not angry. When their shift ended, Shaw left with Defendant.

What happened next was sharply contested at trial. According to Shaw, Defendant drove out of the Taco Bell lot "really fast" and headed across the street to a UNC Primary Care parking lot instead of taking her home. There, he began yelling at her, accusing her of talking to and sleeping with other men. He told her he was "going to show [her] something" and started punching, hitting, and slapping her. Shaw said that she didn't fight back given Defendant's size advantage; instead, she held her hands up to shield her face. She eventually "opened the [car] door" and "tried to run." But Defendant found her and dragged her back to the car by her hoodie. Shaw testified that he beat her again, then drove back to Taco Bell.

Defendant told a different story. He testified that they drove to the UNC parking lot to smoke marijuana together. An argument ensued when he asked Shaw

about another male coworker who had driven her home the night before. Defendant said that he had decided to return Shaw to Taco Bell so the coworker—"John Burrito"—could take her home instead. He denied that Shaw ever tried to get out of the car during this time.

Their accounts diverged further over what happened when they returned to Taco Bell. Shaw testified that the beating continued in the parking lot—Defendant pulled her hair, punched her, bit her face, and twisted her limbs. She tried to leave but he prevented her from doing so, pulling out of the lot and driving her around.

Defendant testified that he told Shaw to get out at Taco Bell. In his version, the passenger seatbelt jammed while he was trying to help her exit. As he leaned over to jiggle it free, his elbow might have accidentally hit her mouth. He reached into the back seat to grab her bag. When he did, a pocketknife fell out—already open. He asked if she planned to stab him, which he said she denied. Defendant acknowledged Shaw had never attacked him before.

Shaw's hand was also cut that night. How it happened is, like everything else, contested. Defendant testified that the cut happened in the Taco Bell parking lot when Shaw tried to grab the knife from him, cutting herself in the process. He gave her a paper towel for the bleeding and placed the knife in his driver's side door handle.

But according to Shaw, Defendant did not see the knife until later, after he drove away from Taco Bell and stopped on a street near her neighborhood. At that point, he threatened to take her to the woods and strangle her. Shaw believed the

threat—she feared that he would kill her. She escaped from the car three times and called 911 each time, but Defendant found her and dragged her back. He drove her around for about twenty minutes, hitting and yelling at her.

When they reached the street where Defendant eventually dropped her off, Shaw testified, he dumped out her bag looking for marijuana. That's when he saw her closed pocketknife and asked if she intended to "kill" him. Shaw explained: "[H]e picked up my knife, and opened it, and then he started threatening me with the knife. Like lunging it at me . . . and I had my hands up[.] So in the process of him doing that that's how I got my hand cut." She tried to get the knife from Defendant but could not.

Defendant's version placed the timing differently. He acknowledged driving Shaw toward his home in Archer Lodge for about ten minutes after leaving Taco Bell. He decided mid-route to take her home instead, dropping her off at her neighborhood's entrance. He conceded that it was possible she thought she was going into the woods during the drive. Defendant testified that he dropped her off in the rain and threw the knife at her through the car window before driving away. And he denied hitting Shaw or threatening her during this part of the drive, though he admitted being "somewhat" mad at her.

Deputy Donald Johnson responded to Shaw's 911 call after dispatch reported that a female caller had phoned multiple times but had been disconnected. When he arrived, Shaw was crying. Blood covered her right hand. She had a small cut and

abrasion on her right cheek and a cut on the inside of her bottom lip. Deputy Johnson called Emergency Medical Services, whose personnel bandaged Shaw's hand.

Shaw testified that after the assault, she had swollen eyes, a cut lip, a bite mark on her face, a half-inch cut on her hand, and a sore body. The State admitted three photographs into evidence and published them to the jury—showing her swollen eyes, cut hand, and cut lip.

While Deputy Johnson was with Shaw, Defendant sent her text messages expressing unhappiness and stating that he no longer wished to have anything to do with her. Defendant later disputed that all the text messages in evidence were sent on 23 September, claiming that some were sent weeks earlier.

After interviewing Shaw, Deputy Johnson went to Defendant's home. Defendant denied being involved in any disturbance or assault. Shaw cut her own hand, he said, while trying to grab the knife from him. Deputy Johnson noticed blood inside Defendant's car and arrested him for assault on a female, assault with a deadly weapon, and communicating threats.

A Johnston County grand jury returned indictments on 27 November 2023, charging Defendant with felonious restraint, assault on a female, assault with a deadly weapon, communicating threats, and attaining habitual felon status. The grand jury later returned superseding indictments upgrading the felonious restraint charge to second-degree kidnapping and recharging Defendant as a habitual felon.

The case was tried in Superior Court, Johnston County, in May 2024.[1]

On 23 May, outside the jury's presence, Defendant indicated that he would testify. The State moved under Rule 609(b) to cross-examine him about several prior convictions, including his 1996 Wake County convictions for second-degree kidnapping and armed robbery—offenses committed more than ten years earlier. *See* N.C. Gen. Stat. § 8C-1, Rule 609(b) (2023). Defendant objected.

The trial court ruled that the State could use the 1996 convictions to impeach Defendant. The underlying facts, in the court's view, were "similar" to the charged offenses: both involved using a weapon to control a victim and a vehicle.

On cross-examination, the State questioned Defendant in detail about the 1996 offenses, including the victim's statement describing how Defendant had allegedly forced him into a vehicle at gunpoint and robbed him. Defendant confirmed that he pled guilty but disputed some factual details. The trial court later instructed the jury that it could consider the prior convictions only for assessing Defendant's truthfulness, not as evidence of guilt.

The trial court charged the jury on second-degree kidnapping, felonious restraint as a lesser-included offense, assault on a female, and communicating threats. The jury began deliberating that afternoon.

About an hour later, the jury returned to the courtroom. A sitting juror asked

---

[1] At the outset, the State voluntarily dismissed the assault with a deadly weapon charge.

to be released because she had her great-grandson's graduation ceremony to attend the next morning. The court granted the request and substituted the alternate juror. Neither party objected. The court instructed the jury twice that they must start deliberations anew with the new juror.

The next morning, before deliberations resumed, Defendant's attorney requested that the court instruct the jury to elect a new foreperson. He wanted to make clear that they were starting fresh. The court gave the jury the option to elect a new foreperson and told them to disregard any prior notes and to "start all over again." The jury decided to retain the original foreperson and began deliberations anew.

On 24 May 2024, the jury found Defendant guilty of felonious restraint—a lesser-included offense of second-degree kidnapping—and assault on a female. After the verdicts, Defendant admitted his status as a habitual felon. The trial court consolidated all convictions for sentencing and imposed an active sentence of 88 to 118 months' imprisonment. Defendant gave oral notice of appeal in open court.

## II. Analysis

Defendant makes two arguments on appeal. First, he argues that the trial court erred in allowing the State to use his 1996 convictions to impeach him under Rule 609(b). Second, he contends that the trial court's substitution of an alternate juror mid-deliberation violated his right to a twelve-person jury under Article I, Section 24 of the North Carolina Constitution. We address each argument in turn.

**A. Rule 609**

Defendant claims that the trial court abused its discretion by failing to make the required findings under Rule 609(b). The court never determined whether the 1996 convictions were "substantially" more probative of his credibility than prejudicial. Rather, it permitted their use because they were factually similar to the charged offenses—a purpose Rule 609 does not allow.[2]

A trial court's decision to admit or exclude evidence under Rule 609 "is reversible only for a manifest abuse of discretion." *State v. Shelly*, 176 N.C. App. 575, 578, 627 S.E.2d 287, 292 (2006) (citing *State v. Ferguson*, 105 N.C. App. 692, 414 S.E.2d 769 (1992)). A manifest abuse of discretion occurs when a ruling is plainly "unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Roache*, 358 N.C. 243, 284, 595 S.E.2d 381, 408 (2004) (citation omitted).

Rule 609 governs when prior convictions can be admitted to attack a witness's credibility. *See* N.C. Gen. Stat. § 8C-1, Rule 609. Subsection (a) states the general rule: Evidence of a felony, Class A1, Class 1, or Class 2 misdemeanor conviction, "shall be admitted" to "attack[ ] the credibility of a witness"—that is, for impeachment

---

[2] Defendant also claims that the State laid no foundation beyond the "bare fact of the convictions" themselves for the court to conduct the required balancing test. We need not address this argument. At trial, defense counsel objected to the admission of the 1996 convictions, arguing that Defendant had not received notice of the State's intent to use them, as required by Rule 609(b). But after reviewing his files, defense counsel conceded that he had received notice "electronically on or about November 30th." Other than the notice element, Defendant raised no objection to the State's foundation under Rule 609(b). This argument is thus waived. N.C. R. App. P. 10(a)(1).

purposes—"if elicited from the witness or established by public record during cross-examination or thereafter." *Id.* § 8C-1, Rule 609(a). Subsection (b) creates an exception for older convictions. It states that "[e]vidence of a conviction . . . is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date," unless two conditions are met. *Id.* § 8C-1, Rule 609(b). First, the proponent must give "sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest" its use. *Id.* And second, the court must "determine[ ], in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." *Id.*

Both subsections of Rule 609 allow the admission of prior convictions only "[f]or the purpose of attacking" a witness's "credibility." *Id.* § 8C-1, Rule 609(a). When a defendant takes the stand, he "place[s] his credibility at issue." *State v. Blankenship*, 89 N.C. App. 465, 467, 366 S.E.2d 509, 511 (1988) (citing *State v. Fisher*, 318 N.C. 512, 350 S.E.2d 334 (1986)). The theory behind Rule 609 is straightforward: "[P]eople who commit certain crimes may not be credible witnesses." *Id.* So our courts have said time and again that Rule 609's "only legitimate purpose" is to cast doubt on a witness's truthfulness. *State v. Carter*, 326 N.C. 243, 250, 388 S.E.2d 111, 116 (1990) (cleaned up). It cannot be used to suggest a defendant is more likely to have

committed the charged crime because he's a "bad man of a violent, criminal nature." *Id.*

And for convictions over ten years old, Rule 609(b) imposes even stricter admissibility requirements. Rule 609(b) creates "a rebuttable presumption" that "convictions more than ten years old [are] more prejudicial to [a] defendant's defense than probative of [his] general character for credibility and, therefore, should not be admitted into evidence." *Blankenship*, 89 N.C. App. at 468, 366 S.E.2d at 511. Our courts have "repeatedly recognized" that exceptions to this presumption are "rare." *Shelly*, 176 N.C. App. at 581, 627 S.E.2d at 293 (citation omitted). So before admitting such a conviction, the trial court must "make findings of fact" demonstrating "that the [evidence's] probative value . . . outweighs its prejudicial nature"—and it must explain how the prior conviction bears on the witness's credibility. *Id.*

Conclusory findings won't do. The trial court must describe "specific facts and circumstances which demonstrate the probative value outweighs the prejudicial effect" of the earlier conviction. *State v. Muhammad*, 186 N.C. App. 355, 363, 651 S.E.2d 569, 575 (2007) (citation omitted). Simply stating "that the probative value of a prior conviction outweighs its prejudicial effect in the interests of justice is insufficient." *Shelly*, 176 N.C. App. at 581, 627 S.E.2d at 294 (citing *State v. Ross*, 329 N.C. 108, 405 S.E.2d 159 (1991)).

The main dispute here centers on the trial court's failure to conduct the proper balancing test under Rule 609(b). In discussing the 1996 convictions' admissibility,

the trial court stated that "with cases or convictions that are outside the ten-year period, you have to establish a nexus as to why . . . that case [would] be relevant to the current case." The court was right that a nexus is required under Rule 609—but it looked for the wrong kind. The connection must run between the prior conviction and the witness's credibility, not between the earlier crime and the charged offenses. *See* N.C. Gen. Stat. § 8C-1, Rule 609.

The trial court treated Rule 609(b) as Rule 404(b).[3] Rather than focus on credibility, it asked whether Defendant used "the same method" in committing the prior crimes—whether both offenses involved "a vehicle," "a deadly weapon," and Defendant having "his hands on" that weapon. The court acknowledged this approach "sounds sort of like [Rule] 404(b) when you can say, well, plan, intent, preparation." Later, it repeated that "it sounds like [Rule] 404" and emphasized the "pattern" of Defendant being "in possession of a weapon in a vehicle where he's controlling the situation." The court ultimately concluded that "the circumstances are similar, substantially similar," making the 1996 convictions "ripe" for admission.

But Rule 609(b) is not a vehicle for admitting evidence of a witness's plan, intent, or pattern—those are Rule 404(b) purposes. By admitting the 1996

---

[3] Rule 404(b) of the North Carolina Rules of Evidence provides that
> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2023).

convictions because they showed that Defendant had used similar methods before, the court invited the jury to infer that Defendant acted in conformity with his prior conduct. It noted that it had "enough there to say that [the 1996 convictions were] not for the purpose of showing" that because Defendant "did it previously, that means he did it this time." But that assurance cannot overcome the substance of its ruling. Committing one crime is not proof of committing another. *See Carter*, 326 N.C. at 251, 388 S.E.2d at 116.

And the trial court's misunderstanding of Rule 609(b)'s purpose infected its findings. Rule 609(b) requires the court to "make findings of fact" demonstrating that the conviction's probative value substantially outweighs its prejudicial effect—and to explain how the conviction bears on the witness's credibility. *Shelly*, 176 N.C. App. at 581, 627 S.E.2d at 293. The court should address at least three factors: (1) "the impeachment value of the prior crime," (2) its "remoteness," and (3) "the centrality of the defendant's credibility" to the case. *Id.* at 582-83, 627 S.E.2d at 294 (citing *State v. Holston,* 134 N.C. App. 599, 606, 518 S.E.2d 216, 222 (1999)). Appropriate findings should also examine whether the prior conviction "involved [a] crime[ ] of dishonesty," "demonstrated a 'continuous pattern of behavior,' " and differed in type from the charged offense. *Id.* at 583, 627 S.E.2d at 295 (quoting *State v. Hensley,* 77 N.C. App. 192, 195, 334 S.E.2d 783, 785 (1985)).

Here, the trial court's findings fell short on every factor. We start with "the centrality of . . . [D]efendant's credibility" to the case. *Id.* at 582-83, 627 S.E.2d at

294 (citing *Holston*, 134 N.C. App. at 606, 518 S.E.2d at 222). The court made no findings on this factor at all. Next, we consider the prior crime's "remoteness." *Id.* The court observed that this was one of the suggested findings for Rule 609(b) but made no findings about it. As for whether the prior conviction "involved [a] crime[ ] of dishonesty," the court stated that "the State is arguing that with the robbery with a dangerous weapon, that's a crime of moral turpitude, dishonesty, veracity" but made no finding of its own on whether these violent crimes actually involve dishonesty. *Id.* at 583, 627 S.E.2d at 295 (quoting *Hensley,* 77 N.C. App. at 195, 334 S.E.2d at 785).

The court also failed to analyze the "the impeachment value of the prior crime." *Id.* at 582-83, 627 S.E.2d at 294 (citing *Holston*, 134 N.C. App. at 606, 518 S.E.2d at 222). That factor asked the trial court to assess whether Defendant's 28-year-old convictions for second-degree kidnapping and robbery with a dangerous weapon bore on his truthfulness. The court never answered that question. Instead, it focused on the fact that Defendant was previously "in a vehicle," "ha[d] a weapon," and used it to control victims. Violent crimes, without more, do not speak to credibility. The trial court's failure to connect Defendant's 1996 convictions to his truthfulness—as opposed to his criminal character—left a legally significant gap in its analysis.

So too did the court's findings on whether the 1996 convictions "demonstrated a 'continuous pattern of behavior.'" *Id.* at 583, 627 S.E.2d at 295 (quoting *Hensley,* 77 N.C. App. at 195, 334 S.E.2d at 785). Again, the court focused on the prior

convictions' factual similarity rather than their bearing on credibility: "[O]nce again, there's a vehicle involved. There is a victim that's in the vehicle. And at some point[, Defendant] us[ed] a weapon to control the situation." These findings suffered from the same flaw as the rest of the court's analysis—they emphasize Defendant's modus operandi, not his truthfulness.

Finally, the court considered whether the 1996 convictions "were of a different type [of crime] from that for which" Defendant "was being tried." *See id.* It noted that Defendant was on trial "for second-degree kidnapping, assault on a female, and assault with a deadly weapon," and that the 1996 convictions were for "robbery with a dangerous weapon" and "second-degree kidnapping." The court saw "a pattern" in the 1996 convictions' "intent, preparation, even identity, purpose, [and] plan." Yet it maintained that the convictions were not "coming in to show that" because Defendant "did it before, that means he did it again this time."

The trial court's approach created a risk the jury might use the past similar convictions as evidence of Defendant's guilt. It treated the convictions' similarities as a reason to *admit* the 1996 convictions. That inverted Rule 609(b)'s logic. Evidence that a defendant committed an "equally heinous" crime "predispose[s] the mind of the juror to believe [him] guilty" and "strip[s] him of the presumption of innocence." *Carter*, 326 N.C. at 251, 388 S.E.2d at 116. It forces him to defend against accusations the indictment never mentioned, confuses his defense, raises collateral issues, and diverts the jury from the charge at hand. *Id.* at 251, 388 S.E.2d at 117. So when a

past conviction resembles the charged crime, the risk that jurors will reason from prior bad acts to guilt increases. *See* Robert P. Mosteller et al., *North Carolina Evidentiary Foundations*, Ch. 6 § 6-31 n. 42 (4th ed. 2022) ("If a criminal defendant is the witness to be impeached, prior convictions for crimes that resemble the currently charged crimes are particularly prejudicial.").

The court's conclusion that "the [convictions'] probative value outweighs any prejudicial effect" cannot salvage its findings. It outlined in detail why the 1996 convictions resembled the charged offenses. But it never explained why they bore on Defendant's credibility. *See, e.g.*, *State v. Artis*, 325 N.C. 278, 307, 384 S.E.2d 470, 486 (1989), *vacated and remanded on other grounds*, 494 U.S. 1023 (1990) (holding that the trial court erred by conclusorily finding that prior convictions had "sufficient connection, supported by facts and circumstances, to outweigh any prejudicial effect" without identifying specific facts showing how the convictions bore on credibility); *Ross*, 329 N.C. at 120, 405 S.E.2d at 165 (same).

Rule 609(b) requires more. Again, the trial court "must make findings as to the specific facts and circumstances which demonstrate the [prior convictions'] probative value outweighs the[ir] prejudicial effect." *Hensley*, 77 N.C. App. at 195, 334 S.E.2d at 785. Because it made no such findings, the court "act[ed] under a misapprehension of the law" and thus abused its discretion. *State v. Robinson*, 383 N.C. 512, 521, 881 S.E.2d 260 (2022).

But Defendant must still prove prejudice to obtain relief. He must show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached" at trial. N.C. Gen. Stat. § 15A-1443(a) (2023). Two questions guide that inquiry: (1) whether "there is substantial evidence of [the defendant's] untruthfulness or untrustworthiness apart from the prior offenses," and (2) whether "there is overwhelming evidence of the defendant's guilt." *Shelly*, 176 N.C. App. at 584, 627 S.E.2d at 295 (citing *Ross*, 329 N.C. at 108, 405 S.E.2d at 158). The answer to both questions is yes.

To begin, there is "substantial evidence"—*i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *State v. Vause,* 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991)—of Defendant's "untruthfulness or untrustworthiness apart from the prior offenses," *Shelly*, 176 N.C. App. at 584, 627 S.E.2d at 295 (citing *Ross*, 329 N.C. at 108, 405 S.E.2d at 158). Defendant denied having any fight with Shaw and denied punching her at any time. He said only that his "elbow might have hit her in the mouth" when he was "jiggling [her] seat belt." This was, he claimed, "the only time [he] could think of because that's the only time [he] actually came in . . . some type of bodily contact with [Shaw]."

Shaw, on the other hand, testified to Defendant's repeated punching, slapping, hair-pulling, and biting. And Deputy Johnson observed injuries consistent with her account: "a small cut and abrasion on her right cheek," "a small cut on the inside of her bottom lip," and a cut hand. A reasonable juror could have viewed Defendant's

insistence that one accidental elbow strike was "the only" contact as untruthful—given the visible injuries that could not have been caused by a single elbow bump and Shaw's detailed testimony about a sustained assault. *See Vause,* 328 N.C. at 236, 400 S.E.2d at 61.

Defendant's testimony denying he restrained Shaw also undermined his credibility. He admitted driving Shaw toward his home in Archer Lodge—a ten-to-fifteen-minute drive in the opposite direction from her house—without asking her permission or telling her where they were going. His reason? "[S]he didn't get out" of his car at Taco Bell. Shaw stated that during this time, Defendant told her "he was going to take [her] to the woods and strangle [her]." He was "hitting" her while also "yelling at [her]." She thought "he was going to kill [her]." When the prosecutor asked, "you didn't ask [Shaw] if she wanted to go, did you?", Defendant responded: "I normally don't." He conceded it was "possible" Shaw thought she was being driven into the woods.

These admissions contradicted Defendant's defense. His case rested on the claim that Shaw stayed with him voluntarily and was never restrained. But his own testimony showed he controlled where she went—driving her away from her home without permission, without telling her the destination, because she "didn't get out" at Taco Bell. A rational juror could find him untruthful when he denied restraining Shaw while also admitting he forced her to go where he chose. *See Vause,* 328 N.C. at 236, 400 S.E.2d at 61.

The evidence of Defendant's guilt was also "overwhelming." *Shelly*, 176 N.C. App. at 584, 627 S.E.2d at 295 (citing *Ross*, 329 N.C. at 108, 405 S.E.2d at 158). On felonious restraint, the State had to prove that (1) Defendant "intentionally and unlawfully restrained" Shaw, (2) she did not consent, and (3) he moved her "from the place of initial restraint by transporting [her] in a motor vehicle." Defendant's own admissions satisfied all three elements. He admitted driving Shaw around for about twenty minutes without her permission—conceding she might have thought she was being driven "into the woods"—and dropping her off in the rain. Shaw testified that Defendant prevented her from leaving multiple times, dragged her back into the car, and threatened to take her to the woods. And Deputy Johnson's observations corroborated her account: he responded to multiple 911 calls and saw her injuries and distress immediately after.

As for the assault on a female charge, the State had to prove that Defendant intentionally assaulted Shaw by "punching, slapping, and biting" her. Shaw testified to exactly that. Deputy Johnson observed injuries matching her account: cuts, abrasions, and swelling. And the physical evidence confirmed Shaw's testimony— the knife, blood in Defendant's vehicle, photographs of Shaw's injuries, and angry text messages Defendant sent during Deputy Johnson's interview with Shaw. Given this evidence, there is no "reasonable possibility that, had the error in question not been committed, a different result would have been reached." N.C. Gen. Stat. § 15A-1443(a).

Defendant counters that the 1996 convictions were particularly prejudicial because they resembled the charged offenses and invited the jury to convict based on his criminal character.[4] We agree the crimes' similarity increased the danger of prejudice. But the trial court gave limiting instructions—both during Defendant's testimony and in its final charge—telling the jury that the 1996 convictions were "not evidence of . . . [D]efendant's guilt in this case" and could be considered only as it related to Defendant's "truthfulness." We presume that juries follow such instructions. *State v. Best*, 342 N.C. 502, 516, 467 S.E.2d 45, 54 (1996). And the discussion about the 1996 convictions took up less than ten minutes in a four-day trial featuring "overwhelming evidence" of Defendant's "guilt." *Shelly*, 176 N.C. App. at 584, 627 S.E.2d at 295 (citing *Ross*, 329 N.C. at 108, 405 S.E.2d at 158). The brief mention of a decades-old conviction could not have changed the outcome.

**B. Juror Substitution**

---

[4] Defendant points to *State v. Harris*, 149 N.C. App. 398, 562 S.E.2d 548 (2002), but that case doesn't help him. There, the defendant was on trial for first-degree murder. *Id.* at 400, 562 S.E.2d at 548. The trial court admitted his 1984 conviction for aggravated battery—committed with a bullwhip against his then-wife. *Id.* at 402-03, 562 S.E.2d at 549-50. We granted the defendant a new trial, holding that the 1984 conviction "shed no light on [the] defendant's veracity" and instead "characterize[d]" him "as a woman abuser and a violent person who would have been likely to" commit the charged murder. *Id.* at 403, 562 S.E.2d at 550. The Court found "a strong possibility" that the 1984 conviction "caused the jury to find defendant guilty of first-degree murder rather than a lesser crime." *Id.*

*Harris* turned on a risk not present here: that an inflammatory prior domestic violence conviction would push the jury to convict of a more serious offense. Here, the opposite occurred. The jury convicted Defendant of felonious restraint—a lesser-included offense of the charged second-degree kidnapping—and acquitted him entirely of communicating threats. These verdicts show that the jury carefully evaluated the evidence and reached measured conclusions. The brief discussion of the 1996 convictions in a four-day trial had no discernible impact. *Harris* is thus inapposite.

Defendant argues that the trial court violated his right under Article I, Section 24 of the North Carolina Constitution to "trial by a jury of twelve" when it substituted an alternate jury after deliberations began. North Carolina General Statute Section 15A-1215(a) "governs the substitution of alternate jurors before a verdict is rendered." *State v. Glenn*, No. COA23-1103, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___ (2025). Under that provision:

> The judge may permit the seating of one or more alternate jurors. . . . If at any time prior to a verdict being rendered, any juror dies, becomes incapacitated or disqualified, or is discharged for any other reason, an alternate juror becomes a juror, in the order in which selected, and serves in all respects as those selected on the regular trial panel. If an alternate juror replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew. In no event shall more than 12 jurors participate in the jury's deliberations.

N.C. Gen. Stat. § 15A-1215(a) (2023). The trial court's unconstitutional application of this statute, Defendant maintains, requires a new trial.[5]

We review constitutional questions *de novo*. *State v. Ducker*, ___ N.C. App. ___, ___, 917 S.E.2d 266, 269 (2025). That means we "consider[ ] the matter anew" and "freely substitute[ ]" our "own judgment for that of the lower court." *State v.*

---

[5] Defendant concedes that he "did not object to the substitution[ ] of an alternate juror after deliberations began" but also that the "constitutional right to a jury of twelve cannot be waived and is preserved for review despite the defendant's failure to object." The State does not dispute this. And in *State v. Chambers*, our Supreme Court held that "issues related to the structure of the jury that found [the] defendant guilty [a]re preserved notwithstanding [the] defendant's failure to object at trial." 387 N.C. 521, 524, 915 S.E.2d 96, 99 (2025). We thus assess the merits of Defendant's argument.

*Harris*, 276 N.C. App. 128, 131, 855 S.E.2d 510, 512 (2021) (citation omitted).

To determine whether the trial court's application of Section 15A-1215(a) violated the state constitution, we examine the constitution's "text," "the historical context in which the people of North Carolina adopted the applicable constitutional provision," and "our precedents." *N.C. State Conf. of NAACP v. Moore*, 382 N.C. 129, 146, 876 S.E.2d 513, 526 (2022) (citation omitted).

Article I, Section 24 of the North Carolina Constitution declares that "[n]o person shall be convicted of any crime but by the unanimous verdict of a jury in open court." N.C. Const. art. I, § 24. "At common law, a jury was comprised of twelve people, . . . and our precedent has long recognized that this common law requirement was engrafted into Article I, Section 24's right to a jury trial." *State v. Chambers*, 387 N.C. 521, 526, 915 S.E.2d 96, 99 (2025) (citation omitted).

In *State v. Chambers*, our Supreme Court upheld the constitutionality of Section 15A-1215(a). *Id.* In doing so, it ruled that the "defendant's constitutional right to a jury of twelve was not violated" when the trial court substituted an alternate juror and "gave the jury exactly the instruction required by statute." *Id.* at 527, 915 S.E.2d at 100. Section 15A-1215(a), the Court explained, contains "two critical safeguards" that keep the twelve-juror requirement "sacrosanct." *Id.* First, it provides that "*in no event* shall more than [twelve] jurors participate in the jury's deliberations." *Id.* at 526, 915 S.E.2d at 100 (cleaned up). And second, it requires trial courts to instruct juries to "begin . . . deliberations anew" if an alternate juror is

substituted after deliberations have begun. *Id.*

That second safeguard "preserves the statute's constitutionality." *Id.* When a jury follows the instruction—as juries are presumed to do—and "restarts deliberations," no risk exists that thirteen people will render the verdict. *Id.* at 526-27, 915 S.E.2d at 100. The jury must disregard any discussion involving the excused juror, and "entirely new deliberations" begin with "the newly-constituted twelve: the original eleven jurors and the substituted alternate." *Id.* at 527, 915 S.E.2d at 100. The ultimate verdict thus comes from the constitutionally required jury of twelve. *Id.*

Here, the trial court instructed the jury to begin deliberations anew once it substituted the alternate juror. So the trial court, under *Chambers*, did not violate Defendant's right to a twelve-person jury under Article I, Section 24.

## III.   Conclusion

The trial court abused its discretion in admitting the 1996 convictions. It misapplied Rule 609(b)'s impeachment-only limitation and did not make the required findings—supported by specific facts and circumstances—that the convictions' probative value substantially outweighed their prejudicial effect. Even so, that error was not prejudicial. And the trial court did not violate Defendant's constitutional right to a twelve-person jury. It properly instructed the jury to begin deliberations anew after substituting the alternate juror, thus protecting that right. Defendant received a fair trial, free from prejudicial error.

NO ERROR.

Judges FLOOD and FREEMAN concur.